Lt. Steve Sutton could reasonably conclude that she had apparent authority to authorize the initial warrantless entry, which took place sometime between 9 a.m. and 9.30 a.m., the date that's at issue in this case. As far as the record shows, all that Lt. Sutton had to go on at this point where he decided he could, in fact, go ahead and enter and that Ms. Mitchell did have authority to consent to that entry, was her assertion that she and Mr. Clay had been living together at this apartment for some number of months. I think the record best demonstrates this, if you'll find it on page ID numbers 260 through 266, where the magistrate judge, Judge Weir, who presided at the suppression hearing, asked Lt. Sutton, what beyond Ms. Mitchell's claim that she had been living there did you have to corroborate what she was saying and lead you to conclude it would be proper to go on, to go ahead and enter at this point? It's a little bit like saying all I saw was his face. It's like the most powerful thing, you were living there. Well, I've not seen any case that the parties have cited or I've found, Your Honor, in which an individual's claim, I've been living there and I'm telling you it's okay to go ahead and go in. The court has deemed sufficient. So how's Gillis different? Is it Gillis? Am I pronouncing it right? Gillis? I believe Gillis is pronouncing it correct. Well, Gillis is different because the police there had some independent knowledge that Gillis resided at this residence. They knew her. They knew, independent of the day that case came up, this lady has a connection and lives in this apartment from time to time. But there's nothing about what they knew after talking to her that would suggest she wasn't living there, right? You're referring to Ms. Mitchell? Yeah, right. True. They, well. She was living there. It turned out to be true. because I didn't want them to kick in the door. And two, I told them the lessee of the apartment was a third party, neither Clay nor Mitchell. Now, Lieutenant Sutton, a grant, said he didn't recall being told that. So there's kind of an ambiguity there about, I think is the answer to your question, his testimony was, I don't recall being told that. Ms. Foster said I had one conversation with the police that day, and I told them that during that conversation. And that took place, we know we can conclude fairly, before they entered, because the maintenance man subsequently went over there and opened the door. He gave him the key. He didn't open the door. I think he opened, my understanding, Your Honor, was he opened the door. And he testified at suppression hearing. He went, this is not a large building, maybe 20 units or something like that. He went to a nearby apartment and worked for some period of time. And they, after making that initial entry, came back and got him and went in and asked him about the door, the closet door, which I'm going to get to in a minute. And he, from what I understand, he let him in, or maybe he did give him the key. And in further response to you, Judge Sutton, Lieutenant Sutton didn't, I mean, Mitchell didn't tell them I never had a key, which is what she testified to. He assumed, according to his testimony, that she didn't have a key that day and she probably had left it behind and fleeing, but he didn't ask her. Okay, which isn't that the reasonable step that, for instance, the Waller case from this court talks about when some kind of ambiguity is raised, the police have a duty to inquire, and what could be more reasonable than expect police to say, all right, well, this is your apartment, do you have a key? Now, if the answer is, I left it behind because I was trying to get away from my boyfriend, that's kind of understandable. But if the answer is, as it would be here, no, I don't have one. I've never had one. But that's an inquiry that should have been made. And if we come back with it. The record doesn't say one way or the other whether she has or had a key. Is that right? No, I asked her in cross-examination, did you ever have a key to this apartment? Not just with you that day, but I mean ever since February when they said they moved in, Your Honor. And the answer was, I never had a key. And she further elaborated at the suppression hearing that she spent substantial amounts of time living at her grandmother's house and that she regarded herself as a guest in Mr. Clay's residence at this apartment. Her story changed from the day of the entry to the suppression hearing, though, correct? She was back with DeMille at that point, was she not? Well, I don't necessarily agree with you, Your Honor, that her story changed. I mean, she did have clothing in the apartment. She did spend some time there. I mean, she was at least a frequent guest, certainly. I mean, she's the one who described herself as a guest. Didn't she also have some of her baby things in the apartment? She had a small child, and I think there were some toys and strollers. There was a playpen in the closet, right? There was a playpen in her closet. Yeah, there was some of the children's stuff in the closet. So, I mean, the record does demonstrate that she had some connection and frankly does substantiate her assertion that we've been living there together. I've been living there pretty often with him for the last few months. Going back to you asking about Gillis, Judge Sutton, another key factor there is the girlfriend had a lease that showed, a copy of the lease that she presented to the police that day that identified her as the lessee. And as I said here, the testimony from Lieutenant Sutton is I didn't really have any information about who the lessee was, but that's a distinguishing feature. And also in Gillis, the girlfriend was able to produce a key not to the entry door but to some interior door inside the dwelling, which is something somebody would have who has a stake as a resident or at least some right to be in there would have. And, of course, Ms. Mitchell had nothing like that. Out of curiosity, is there an actual authority case? I know we're talking about parent authority, but I'm just curious, is there an actual authority case that says if you don't have a key, end of story, you don't have actual authority over the place even though you live there? No, I don't think the court has ruled that if you don't have a key, you can't have actual authority. If that's true, then why is the key so important? I mean, what she said was true. She was living there. She was living there for a fair bit of time. They were boyfriend and girlfriend. It's just not that extraordinary to say whether as a matter of actual authority or parent authority, you're allowed to come and go as you please and also let other people in. If the court were to rule an unsubstantiated claim by an individual that I've been living here, an individual unknown to the police that I've been living here with my boyfriend is sufficient to authorize police to make a warrantless entry, at that point the court would be taking a step, as I see it, that its case law has not yet taken. I think the cases the parties have briefed have indicated that's where you start, of course. I live here. I'm saying it's okay if you go in. But I think the court has always required some additional circumstances, some additional information, so the police can act on something more than just an individual's word. Of course, the idea of Peyton v. New York is the dwelling is the exterior of the dwelling is the core value of the Fourth Amendment. Doesn't she show up at the police station that day with that evidence, the fact that she's got some facial? It's not in the record, but her appearance photos were taken that day that substantiated that she'd been in a physical altercation. They're not in the record in this case, but yes, Your Honor, that's correct. And her cell phone, there's a cell phone found in the parking lot at some point, whether it was before they went in or not. I guess after they'd wrapped up, after they'd gotten the warrant and done the search and inventoried the evidence and they were cleaning up, he answered in response to Mad Straight Wears, you know, then I saw the cell phone. And Ms. Mitchell at that point, he said, was gone. So your theory is the only piece of evidence they had is boyfriend-girlfriend and that they stopped too quickly, they should have asked more questions? Is that your basic theory? The information that Lieutenant Sutton had, and he's the one that made the entry and frankly is responsible for deciding it's okay for us to go ahead and go in, all the information, the only basis he had for concluding at that point that he should is Ms. Mitchell's claim that she'd been living here. And again, Your Honor. Did he find out how long she'd been living there? I believe she told him for several months. Okay. But he didn't corroborate that. That's two pretty big things. Well, I don't think authority turns on duration of how long you've been living there. Really? It can in some circumstances, but if I move into a new house next week, I'm feeling like I have as much right to say who comes and goes from there as I do. No, but I'm referring to a parent authority. What do you mean? Well, the longer the person claims they've been boyfriend, girlfriend, and living in the place, the more it seems to suggest a parent authority, no? Particularly in the absence of a key. Well, I guess the longer you'd live there, the more likely it would be, on the other hand, that you would have a key to the apartment, okay, that you would be able to provide additional information that would substantiate your claim. My kids don't have keys to my house, and they let people in the house all the time. It never occurred to me to complain, but maybe after this case I'm going to say that's it. As I see it, for the court to... Hell, I don't have any key to my house. Anyway, I see my time is up, but anyway, thank you. Okay, thank you. Thank you. Good morning to the court. My name is Andrew Smith. I'm an assistant U.S. attorney. I'm here today on behalf of the United States. I'd like to focus the majority of my time on this issue. I think we spent the most of Mr. Abel's time, and that is kind of, admittedly, the facts in this case are a little bit confusing. We have a lot of officers. Lieutenant Sutton heads out to the apartment with actually two other officers. You have officer Quires with the victim, and then you have two other officers actually executing the search warrant. All that kind of creates a lot of noise and a lot of confusion, admittedly. But I think it has the potential to overshadow how much Lieutenant Sutton really knew before he went in that apartment. I think in the briefing there's a little short shrift on Clay's standpoint as to how much he actually knew. And Judge Sutton, you made a few of these points just a moment ago. But if we step back and consider what really happened that morning, the officers didn't wake up that morning deciding they were going to click Clay's door in. They were responding to a call from a woman who claimed she had been domestically assaulted. She came in, in person, to the police station. She showed up with her real name. Her face had injuries on it, and that is in the record, by the way. Both Quire and Sutton testified at the suppression hearing that the marks on her face were visible. She proceeds to tell them a specific address at a specific place in Frankfurt, a specific apartment at a specific address. She identifies a specific location within that apartment where the guns and drugs that she identified are. And then she travels with the police to that location. So it's not a case here where she merely shows up and says, hey, I live at this place, you should go search it. They have a host of kind of corroborating things that they can both visibly see and that she's telling them that add a lot of credence to what she says. What was the rush? Why not get a warrant? Well, in this case, and I think as the facts show, what we have here is a woman who's been assaulted. The other factor considered, too, is her expression of interest to go back to the apartment, get her things there. Again, that's another factor that kind of corroborates this is, in fact, where she lives. She has authority over that. But she also says he has a gun. She fears that he's gone back. And so their goal number one, and if you read the testimony of the officers below, their initial entry in there wasn't really to go in and search around. It was to search and try to find him. What we have here is a guy who they've just learned has a gun, apparently is dealing drugs, and has apparently just assaulted someone. Certainly there are more accident circumstances that you could kind of manufacture, but that indicates a pretty compelling need for the police to go do some police work and find this guy. So when Officer Sutton went in through that door, he knew far more than that this was just a boyfriend and girlfriend. He had a host of kind of corroborating factors. Did he have the SWAT with him at the time? Excuse me? Did he have the SWAT team with him at the time? He didn't have the SWAT team with him at the time. He had two other officers who met him there, and the testimony was generally he calls the leasing office. They come and provide a key. The representative of the leasing office, the maintenance guy, for lack of a better term, goes around to a different apartment. The choir at this time is kept. Mitchell is out there at the scene, Mitchell, the consenting girlfriend, ex-girlfriend, but they've taken her around the corner for her safety. So everything kind of lends itself to this picture where the police do believe there's a potentially dangerous individual in there. They're going to look for him. It's strange not to have a key. The longer you've been living together, the odder it is. Well, again, I think it kind of depends on your living situation, as I think the panel noted. I don't think it's actually that remarkable. It's a general proposition for anyone not to have a key on them at a given time, even sometimes even in a place they live in. But certainly in these circumstances where we, again, keep in mind what the police knew at that time. What they knew is the narrative is this woman had literally been assaulted. She was essentially running for her safety. She goes off to her grandmother. She shows up at the police station having been assaulted. It's completely reasonable, and this is what Lieutenant Sutton said based on his 18-some-odd years of experience. It's completely reasonable to conclude in those circumstances that she's not going to grab her key before she leaves in those circumstances. In this case, this court has repeatedly held that the key isn't really determinative of anything. It's certainly something you can consider, but in Penny, the consenting girlfriend didn't have a key. In U.S. v. Hudson, there was no key. In Hayes v. Bolton, there was no key. Pratt v. United States, there was no key. So, again, a key is unfortunately there is no kind of enumerated list, an exhaustive list of things you can look at to determine a parent authority because every case is going to be a little different. But certainly a key is not something that tips the scales way off kilter here. And certainly under these circumstances, again, given kind of the exigencies with which she left and kind of the other circumstances the police know about, it's not really a red flag in those circumstances at all. And the other key factor that's brought up was the name on a lease. And, again, I think, you know, as this court has recognized, as the district court recognized below, just kind of the realities of how people live together nowadays, the legal formalities of whose name on a lease is not really determinative at all of authority to kind of exercise dominion and control over a property. I mean, you can go to any college town, you know, go down to Lexington, which is where our office is, and how many kids are living there in the summer on a kind of informal sublet with someone. It doesn't mean they don't have authority to let people in and out of the apartment. A lot of their names aren't going to be on the lease. So, again, it's something, you know, I suppose it's something you can consider, but it's by no means determinative here. And, indeed, Clay's name wasn't on the lease. Neither of their names were on the lease. So I think that kind of puts aside this idea of apparent authority. But even if the court wanted to somehow look past all that and look at the warrant, there are a couple points that bear mentioning based on the briefing. Clay argues that, looking to the text of the search warrant itself, that if the court were somehow not to credit the observations of the police from that initial entry meeting, they would find that. Out of curiosity, did Clay have a key to the apartment? I don't think it's in the record one way or another. What we do know is that he was renting. Clay, interestingly enough, had been a resident at this apartment complex, at a different apartment. Apparently he got kicked out, I think, for failing to pay rent or something. And so the leasing office kind of knew his name from that circumstance. He then kind of informally sublets it from another friend who testified, whose name was on the lease. It seems like Clay had a key and also had a key. There's this reference to the locked closet inside. So it seems like he did have a key. Well, I guess it would make sense, given that the house was locked when they arrived. It's kind of a foolish move. I guess if you have drugs and guns, who knows what you're worried about. I think it's worth mentioning, going back to their initial entry and kind of the reasonableness of the police conduct here, we talked about kind of what Sutton knew when he went in. But it's worth noting, they go in and do a protective sweep, and then they encounter a closet that's locked. Now, the record's a little unclear, but the court found below that Mitchell had told them of this locked closet beforehand. But they encounter a locked closet, and they're clearly not just trying to rip apart doors and look for evidence, you know, damn the cost. They encounter a locked closet, and what do they do? They go get a search warrant, which is, again, kind of they encounter a locked closet. That's a reasonable manifestation that, okay, she has the ability to consent to this space over here, but not this locked closet here. I think it really does corroborate that the police were acting reasonably when they went in there, that they weren't just looking to secure evidence at all costs. What about the firearm and furtherance of? Sure. The 924C conviction, you know, I guess it bears mentioning to step back first and note that really the briefing only focuses on one of the six Mackey factors that the court has articulated, and I think that's for a reason. That's because the other five clearly cut against Clay, and those include, you know, when we step back on what we're really asking in the 924C cases, is this drug being used in furtherance of dealing drugs, or is this just somebody's hunting rifle on the wall and there just happens to be some drugs there? If you look at those other factors that aren't even addressed in Clay's brief, you know, is the gun legally owned? No, he's a convicted felon. Is it loaded? Yes. What kind of handgun? It's a small, I mean, what kind of gun, what kind of firearm? It's a small handgun. There was expert testimony about that's consistent with what drug traffickers typically use. So all those are already kind of stacked against Clay, and so the only thing that he really hangs his hat on is kind of how strategically is this gun located, and all of that rests on the idea that the closet was locked. I'd submit to the court that the lock on the closet is completely immaterial because what the testimony below was is that the drugs were inside that locked closet, and then when he was dealing the drugs, he was always dealing it from that closet. So in other words, whenever he was engaged in the drug trafficking activity, the closet's open, the firearm's here, the drugs are over here, mere feet away from each other. The fact that when he leaves, he locks it all up doesn't affect the accessibility of that firearm when he's actually engaged in the drug trafficking activity. Because otherwise, any time you have any firearm that's found behind any locked door, when the police find it, it would presumably be inaccessible. That's, of course, not the case. So I think, you know, we cited a number of cases in our brief, and Clay attempts to distinguish them, but I think those attempts to distinguish them just kind of led credence to how readily accessible this firearm was. Again, it's a loaded gun, it's found on the same shelf where there's, I think, something like $8,000 of cocaine found within mere feet of each other. The only thing that arguably renders it inaccessible is that it's zipped up in a bag at the time it's found, but again, that doesn't render it inaccessible compared to, you know, we have cases where a firearm is found under a mattress, it's found in an attic, it's found out in the garage. The whole idea here is when we look at all the factors in their totality, it's pretty clear, and there's very, very strong evidence below, that that drug was being possessed in furtherance of dealing cocaine. I want to work back just a couple more points on the initial entry that searched the warrant. I would say, you know, putting even the warrant, you know, you can argue about which point should be excised. I would say Clay suggests that the government concedes that a portion of the search warrant should be that the government agrees that his proper or his suggested kind of edit to the search warrant would be proper. I would just note for the record he claims that the following sentence should be excised from the warrant should this court somehow find the initial entry was unlawful, and it's the portion that reads, and observed a locked closet in the rear bedroom. There was no key available for this locked closet. The complainant also advised that Clay usually keeps a firearm in the closet and cocaine in the top dresser. The government doesn't concede that that would be the proper edit if one were necessary, and of course it certainly doesn't concede or believe that any kind of edit is necessary because I think all of that was properly considered because the initial entry was lawful. But if there were some kind of edit, the court certainly shouldn't strike the portion that says the complainant also advised that Clay usually keeps a firearm in the closet and cocaine in the top dresser because the record below shows that Mitchell told officers that the closet was locked before they went in there. That wasn't something they gained as a product of that initial entry. So what we have here, kind of moving past the search warrant, is even if for some reason the court were to find, and it absolutely shouldn't, that the initial entry was problematic, and even if after review here it finds that the search warrant was problematic, those are kind of two hurdles that he has to clear. There's still good faith. And ultimately here we have officers who clearly engaged in a very reasonable course of conduct. They have a very credible complainant shows up. No red flags ever really arise. They go to the Commonwealth attorney with a warrant affidavit. The Commonwealth attorney signs off on it. They present it to a magistrate who there's no evidence that he's not neutral or detached. He issues that warrant. And in reliance on that, they go in, they execute the search warrant, they find the gun, they find the drugs. That's a perfect case for good faith, even if there was something wrong with the initial and lawful entry, which there wasn't. And I think under this, there was a little bit of confusion in Residence of the Braves about the McLean decision, the Davis decision back in 2005, 2006 from this case, from the circuit. But I think in the time since, in the Herring case, the Davis case before the Supreme Court, it's become clear kind of really what the exclusionary rule is all about. The exclusionary rule is really meant to deter future misconduct that's really intentional or reckless, and there's just nothing like that present in this case that rises to that level. If the court has any other questions, I'd be happy to answer them. Otherwise, we'll just rest on the breeze. Apparently not. Thank you. Thank you. Your Honor, I would agree with Mr. Smith that whether or not a person can produce a key at the point is not determinative. The court's case law would recognize that's not determinative. But the court's case law, and whether or not they're on the lease, is not necessarily determinative. But I don't agree that the inability to produce a key and not being on the lease aren't red flags that warrant the type of further inquiry that the court directed in Waller was appropriate. And had that further inquiry been undertaken here, you'd have learned Sean Gross is the lessee. And, frankly, Ms. Foster, the leasing agent, says she told him that. And you'd have learned that Ms. Mitchell never had a key. Now, there may be follow-up questions. But you also would have learned they lived together for a long time. I mean, that all would have been confirmed, right? Well, perhaps it would have been. By whom? I mean, Ms. Mitchell had already made that request. Yeah, but I'm just saying your point is there were red flags, so keep asking. And that seems productive and useful in a case where further asking would have found something devastating to the government's position. But I'm just not sure that's true here. All the inquiry in the world would still have established she lived there. Her clothes were there, and she lived there for many months. Perhaps it would have, but it didn't happen. And that's why the court directed to preserve the Fourth Amendment values that are at issue here. Find out what's going on. Find out what the status of these people is. It's not sufficient just to rely upon the word of somebody who claims they have authority. The court's never held that alone from an unknown person is sufficient for a police to conclude they have apparent authority to authorize their warrantless entry. The court's always required there be additional facts and information obtained or available, maybe independent knowledge. Maybe there have been, for instance, Gillis, actually Penny is a better example, where the couple had a very tempestuous relationship and the police knew them all too well. But there's nothing like that here. There were red flags raised that warranted further inquiry. And had that been made, they would have found out Mitchell never had it. There's a third party on the lease. With respect to the weapon, really all the record says it's in the closet tucked away in a zip bag. Mitchell said she saw it while they were moving in. And for all the record says it never came out, ever, out of the closet or out of the bag. It was never referred to. Surely to indicate it's possessed in furtherance of seeing somebody take it. So it's in the same closet, but it's behind a drill, correct? I mean, in other words, it's not visible from the front? That's right, Your Honor. Your Honor, I understand the testimony to be when you look directly in, at the middle of the shelf is a Purple Crown Royal bag that contained cocaine, some cash, hydrocodone to marijuana. Next to it is a drill. There's perhaps a plastic container it came in and tucked away in the closet. Over in the corner is the gun bag zipped up. In the same closet, not necessarily immediately accessible? It's not that far away, I have to concede that, but zipped. And it was loaded? It's a different thing if it's tucked under. Even if it's never moved, never been referred to, if it's sitting under the sofa cushion, that's pretty easy use, pretty easy access, but the next room, zipped up in a bag, that's not easy. What about putting it in a safe? What if you have the gun and the money and the drugs in a safe? You open the safe, you access them all, or you keep the safe closed so no one gets access to any of them? Isn't in furtherance pretty legitimate in that setting? It goes beyond mere possession. There has to be some indication that it serves the mission of the drug dealing, and just being there isn't enough proof of that service. I think that's what the case law shows, Your Honor. Thank you all very much. Thank you. Thank you very much, and the case is submitted.